# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| WANDA G. STURA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CIV-13-500-JHP-SPS |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of the Social ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

The claimant Wanda G. Stura requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). She appeals the Commissioner's decision and asserts the Administrative Law Judge ("ALJ") erred in determining she was not disabled. For the reasons set forth below, the Commissioner's decision should be REVERSED and the case REMANDED to the ALJ for further proceedings.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if h[er] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful

work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Sec'y of Health & Human Svcs.*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."

---

[1] Step One requires the claimant to establish that she is not engaged in substantial gainful activity. Step Two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied. If she *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity ("RFC") to return to her past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of her past relevant work or if her RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

## Claimant's Background

The claimant was born August 1, 1967, and was forty-four years old at the time of the administrative hearing (Tr. 46). She completed her GED, and has worked as a bookkeeper, production assembler, cashier, and prep cook (Tr. 28, 236). The claimant alleges that she has been unable to work since January 1, 2002, due to bi-polar disorder, manic depression, COPD, emphysema, and asthma (Tr. 231).

## Procedural History

On October 1, 2009, the claimant applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85. Her applications were denied. ALJ David W. Engel conducted an administrative hearing and determined that the claimant was not disabled in a written opinion dated July 5, 2012 (Tr. 13-30). The Appeals Council denied review, so the ALJ's opinion is the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. §§ 404.981, 416.1481.

## Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation. He found that the claimant had the residual functional capacity (RFC) to perform a limited range of sedentary to light work, *i. e.*, she could lift/carry/push/pull at light and sedentary exertion, stand and/or walk for two hours in an eight-hour workday, and sit for 6 hours in an eight-hour workday, but she was unable to climb ropes, ladders, and scaffolds, or work in

environments where she would be exposed to unprotected heights and dangerous moving machinery parts or environments where she would be exposed to extremes of temperature. Furthermore, she could occasionally climb ramps or stairs, bend, stoop, crouch, and crawl, reach overhead, or use the foot pedals (Tr. 18). Finally, he indicated that the claimant was able to understand, remember, and carry out simple to moderately detailed instructions in a work-related setting, and could interact with co-workers and supervisors, under routine supervision (Tr. 18). The ALJ then concluded that although the claimant could not return to her past relevant work, she was nevertheless not disabled because there was work she could perform in the regional and national economies, *e.g.*, circuit board assembler or food and beverage clerk (Tr. 29).

## Review

The claimant's sole contention of error is that the ALJ failed to properly consider her mental functioning limitations, particularly those expressed by state reviewing physicians. The undersigned Magistrate Judge finds that the ALJ *did fail* to properly consider the claimant's mental impairments, although not for the specific reason asserted by the claimant, and the decision of the Commissioner should therefore be reversed.

The ALJ found that beginning February 28, 2008, the claimant had the severe impairments of bipolar, depression, chronic obstructive pulmonary disease and allied disorders[2] (Tr. 16). Relevant medical records reveal that the claimant began treatment at Bill Willis Community Mental Health Center on February 28, 2008, presenting with

---

[2] Noting the alleged onset date of January 2, 2002, the ALJ noted that there were no available medical records prior to February 28, 2008, and he therefore found the claimant's alleged impairments were non-severe prior to February 28, 2008 (Tr. 16).

problems of depression, anxiety, a bi-polar diagnosis ten years previous, and an inability to afford her medications (Tr. 314). She was assessed with bipolar I disorder, most recent episode mixed, and post-traumatic stress disorder (PTSD), and given a global assessment of functioning score of 55 (Tr. 318, 325, 331). At some point, the claimant moved away and then returned to the area. On June 4, 2010, the claimant again presented for treatment at Bill Willis and was assessed with PTSD, acute, and major depressive disorder, recurrent, severe with psychotic features, as well as alcohol abuse and a GAF of 52 (Tr. 411).

On September 11, 2009, the claimant presented to Providence of Oklahoma with exacerbation of her bi-polar symptoms, anxiety, and depression and related problems of domestic violence toward her and her daughter (Tr. 345-350). On December 23, 2009, the claimant presented to Melinda Shaver, Psy.D., for a consultative mental exam, noting that the claimant appeared "un-kept" and that her mood was depressed and she had a flat affect (Tr. 384). She also noted that the claimant appeared unable to complete tasks in a timely and appropriate manner due to her bipolar disorder, but could read and play video games, and that she had good insight in that she knew her conditions and took her medications, but that she continued to feel depressed and unmotivated (Tr. 386-388). Dr. Shaver then diagnosed the claimant with bipolar I disorder, most recent episode depressed, severe without psychotic symptoms, and a GAF of 41 (Tr. 388).

On January 27, 2010, state reviewing physician Bernard Pearce, Ph.D., found that the claimant had moderate degrees of limitation in restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining

concentration, persistence, or pace (Tr. 399). After summarizing the evidence, Dr. Pearce stated, "Semi-skilled (without public contact)" (Tr. 401). In the more detailed mental RFC assessment, Dr. Pearce found that the claimant was moderately limited in the ability to understand and remember instructions, carry out detailed instructions, and interact appropriately with the general public (Tr. 403-404). He then opined that the claimant could perform simple and some complex tasks and relate to others on a superficial work basis, could not relate to the general public, but could adapt to a work situation (Tr. 405). On August 26, 2010, Laura Lochner, Ph.D., reviewed the claimant's medical record and found that the claimant had the same moderate limitations as set forth by Dr. Pearce and could perform semi-skilled work with no public contact (Tr. 425-441). She further found in a mental RFC assessment that the claimant could perform simple and some complex tasks, could relate to others on a superficial work basis, and could adapt to a work situation (she made no statement as to relating to the general public) (Tr. 427).

The claimant went to Calming Connections in Tahlequah, Oklahoma, and underwent a clinical inventory on September 2, 2010 (Tr. 494). The claimant's complaints and behaviors paralleled an Axis I diagnosis of schizoaffective disorder, generalized anxiety disorder, and PTSD, with Axis II personality disorders of dependent personality disorder and schizotypal personality disorder with avoidant personality traits and self-defeating personality traits (Tr. 494-495). It was recommended that she receive intensive counseling services (Tr. 495). On April 11, 2011, the claimant underwent an initial psychiatric evaluation for treatment at Calming Connections in Tahlequah, Oklahoma. She appeared to be clean and casually groomed, with a wide-eyed

appearance and increased eye contact and psychomotor activity (Tr. 475). She was assessed with PTSD – acute and chronic, and a mood disorder NOS with potentially psychotic features, and a current GAF of 39 with a highest in the past year of 41 (Tr. 475). Dr. Deborah Jennings, M.D., also noted that a contributing factor/problem was a recent relocation to a women's shelter (Tr. 475).

The claimant was also treated at Hartsell Psychological Services, Inc., where she was assessed with PTSD, generalized anxiety disorder, bipolar II disorder, and a current GAF of 49 on December 23, 2011 (Tr. 506). Treatment notes during this time reflect that the client sought treatment because she had been off her medications; during counseling sessions she was at times neat and clean, and other times unkempt (Tr. 516-533). At one session, she reported taking more of her medication than prescribed, and her "peculiar" behavior was noted (Tr. 530).

At the administrative hearing, the claimant discussed the medications she was taking, including those to treat her mental impairments, and stated that she was receiving counseling at Hartsell at the time of the hearing (Tr. 57-60). She further testified that she began having panic attacks and anger at work, and ultimately had threatened to kill a co-worker, resulting in her losing that job (Tr. 60-61). She reported that she had been doing better on her medications, but that her depression had been giving her problems for about three weeks (Tr. 61). She stated that she believed medications helped but she was not able to work because she had difficulty even going to the grocery store, and that she had gotten kicked out of the women's shelter because she could not get along with the other people there (Tr. 64-65). She stated that she had been fired from most of her jobs

because she had difficulty with people telling her what to do, or she would have a breakdown (Tr. 65).

In his written opinion, the ALJ summarized the claimant's testimony and provided a lengthy recitation of the medical evidence (Tr. 18-28). As to her mental health treatment, he summarized: (i) her 2008 initial assessment at Bill Willis and the associated GAF of 55; (ii) treatment notes from Bill Willis indicating her history and medication adjustments; (iii) her report of bipolar disorder to Dr. Schatzman; (iv) her unkempt appearance and flat affect with Dr. Shaver, as well as reports of drug use and history of domestic abuse by her husband and diagnoses of bipolar I disorder with a GAF of 41; (v) the claimant's return for treatment and medication at Bill Willis in 2010; (vi) her presentation and initial assessment at Calming Connections, including diagnosis of PTSD and mood disorder with a GAF of 39; (vii) further medication adjustment through Calming Connections; and (viii) treatment at Hartsell to get back on her medications, as well as counseling notes from 2012 and termination of treatment on March 24, 2012, due to non-participation (Tr. 20-25). The ALJ did not mention any of the state reviewing physician opinions. He then found that the claimant exaggerated her symptoms, including her disabling pain, because she could perform household chores and had been able to care for her daughter, and her medications were "relatively effective, when taken as prescribed" (Tr. 25-26). He found her statements regarding inability to afford medications not credible because there are public facilities available, and she had gone through periods of non-compliance and had admitted in treatment that she struggled

with appointments (Tr. 26). He further found the claimant not truthful regarding drug usage, and faulted her for her failure to quit smoking (Tr. 27-28).

Although the ALJ found that the claimant's bipolar disorder, depression, and "allied disorders" were severe impairments, he failed to include any limitations related to either in the claimant's RFC (Tr. 12-22). *See Timmons v. Barnhart*, 118 Fed. Appx. 349, 353 (10th Cir. 2004) (finding the ALJ should have "explained how a 'severe' impairment at step two became 'insignificant' at step five.") [unpublished opinion]; *see also Hamby v. Astrue,* 260 Fed. Appx. 108, 112 (10th Cir. 2008) ("In deciding Ms. Hamby's case, the ALJ concluded that she had many severe impairments at step two. He failed to consider the consequences of these impairments, however, in determining that Ms. Hamby had the RFC to perform a wide range of sedentary work.") [unpublished opinion]. Indeed, the ALJ devoted much of his discussion at step four to questioning his determination at step two, *i. e.*, the severity of these impairments, and further finding her not credible because of her history of noncompliance. *See McCleave v. Colvin*, 2013 WL 4840477, at *6 n.6 (W.D. Okla. Sept. 10, 2013) ("Additionally, the ALJ found Plaintiff's subjective complaints not credible in part because of evidence of her noncompliance with prescribed psychotropic medications. However, the ALJ did not consider whether Plaintiff had an acceptable reason for failing to follow her prescribed treatment, *which could include her bipolar disorder*.") [emphasis added]*, citing* 20 C.F.R. §§ 404.1530(c), 416.930(c) *and Jelinek v. Astrue,* 662 F.3d 805, 814 (7th Cir. 2011) ("ALJ's assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference."). Instead,

the ALJ should have explained why the claimant's severe mental impairments did not call for corresponding limitations in the RFC. *See Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence that he rejects."), *citing Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir 1984). In particular, the ALJ should explain how the claimant's unchallenged evidence related to her problems with authority and getting along with others (to the point she got kicked out of a women's shelter) translates to the ability to interact with co-workers and supervisors, under routine supervision.

Furthermore, the ALJ chose to ignore other probative evidence as to the limiting nature of the claimant's mental impairments. For example, the claimant was assessed with some very low GAF scores throughout the course of her mental health treatment, including a 39 at one point. "[A] GAF score between 41 and 50 indicates [s]erious symptoms (*e. g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e. g.*, no friends, inability to keep a job)." *Lee v. Barnhart*, 117 Fed. Appx. 674, 678 (10th Cir. 2004). "Although the GAF rating may indicate problems that do not necessarily relate to the ability to hold a job," *Oslin v. Barnhart*, 69 Fed. Appx. 942, 947 (10th Cir. 2003), "[a] GAF score of fifty or less . . . *does* suggest an inability to keep a job." *Lee*, 117 Fed. Appx. at 678 [emphasis added], *citing Oslin*, 69 Fed. Appx. at 947. Instead of reciting the GAF scores and implicitly rejecting them by failing to analyze how they affected the claimant's functioning, the ALJ should at a minimum have discussed the claimant's

multiple scores below (and above) 50 and explained why they were not due to any occupational factors. *See Simien v. Astrue*, 2007 WL 1847205 at \*2 (10th Cir. June 28, 2007) ("The ALJ was tasked with determining the level of [claimant's] functioning within the six domains, yet he made no mention of [claimant's] GAF ratings. We agree . . . that he could not simply ignore this evidence."); *Givens v. Astrue*, 251 Fed. Appx. 561, 567 n.4 (10th Cir. 2007) (noting that "the Commissioner argues that a low GAF score may indicate problems that do not necessarily relate to the ability to hold a job[,]" but finding that "[e]ven assuming this is true, the ALJ's decision does not indicate he reached the conclusion that Ms. Givens' low GAF score was due to non-occupationally-related factors.").

Because the ALJ failed to properly analyze evidence of record as to the claimant's mental limitations, the Commissioner's decision must be reversed and the case remanded for further analysis by the ALJ. If such analysis results in adjustments to the claimant's RFC, the ALJ should re-determine what the claimant can perform, if any, and ultimately whether she is disabled.

**Conclusion**

The undersigned Magistrate Judge hereby PROPOSES a finding by the Court that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. The undersigned Magistrate Judge thus RECOMMENDS that the Court reverse the decision of the Commissioner and remand the case for further proceedings. Any objections to this Report and Recommendation must be filed within fourteen days. *See* Fed. R. Civ. P. 72(b).

**DATED** this 6th day of March, 2015.

_____
**STEVEN P. SHREDER
UNITED STATES MAGISTRATE JUDGE**